Roy C. KIRBY, Appellant,

v.

STATE of Alaska, Appellee.

No. 5738.

Court of Appeals of Alaska.

Aug. 27, 1982.

William H. Fuld, and Peggy Alayne Roston, Anchorage, for appellant.

Charles M. Merriner, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C. J., COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

A two-count indictment charged Roy C. Kirby with the murder of Jerry Hite. In a jury trial before Judge Ralph Moody, Kirby was found not guilty of Count I of the indictment charging murder in the first degree, AS 11.41.100(a)(1), but was found guilty of Count II of the indictment charging murder in the second degree (felony-murder), AS 11.41.110(a)(3).[1] Kirby appeals to this court alleging various errors relating to the second count of the indictment. We

have decided that Kirby's conviction must be reversed because the trial judge did not instruct the jury on the provisions of AS 11.41.115(c), the felony-murder merger doctrine.

It is undisputed that Kirby shot and killed Hite on June 22, 1980. The circumstances surrounding the murder, however, are subject to dispute.

On June 22, Kirby and a friend, Charles Boggs, met a man named Marcellus Shepherd in an Anchorage bar. According to Shepherd, Kirby asked him if he knew where Kirby could buy some cocaine. By contrast, Kirby testified that it was Boggs who talked to Shepherd about purchasing the cocaine.[2] In any case, Kirby drove Boggs and Shepherd to the Coffee Cup where they met Jeanie Erickson. Shepherd knew Erickson and he introduced her to Kirby and Boggs. Kirby testified that he had never met Erickson before, although Erickson thought that she knew him. In fact, Erickson did not really know Kirby; she was merely confusing him with a friend's ex-boyfriend who was also named Kirby. In any event, Shepherd talked to Erickson about buying some cocaine, and Erickson agreed to arrange a sale.

Kirby then drove Boggs and Erickson to the home of Jerry Hite, located approximately one block from the Coffee Cup. Erickson was to purchase the cocaine for them at Hite's house.[3]

According to Erickson, Boggs gave her a one-hundred dollar bill and Kirby gave her a twenty.[4] Kirby, however, claims that Boggs gave Erickson both bills.[5] Erickson

1. These statutes are set forth in note 12 *infra.*

2. A significant point of controversy at trial was whether Kirby was actively involved as a buyer in the cocaine sale or whether he was merely accompanying Boggs. Boggs never testified at trial.

3. At trial, Kirby testified that he had driven because Boggs asked him for a ride. Upon cross-examination, the assistant district attorney questioned Kirby as to why he would give Boggs a ride in light of the short distance and the fact that Kirby allegedly had no interest in the cocaine which was to be purchased. Ap-

parently, the assistant district attorney was trying to show that Kirby did in fact have an active interest in the cocaine.

4. According to Erickson, at this time Kirby promised to pay Boggs back before leaving town later in the week.

5. Kirby denied any talk of his paying Boggs back. According to Kirby, he was not buying any cocaine so he therefore had no money invested in the deal. On cross-examination, the assistant district attorney pointed out to Kirby that in his earlier statement to the police he had used phrases such as "our money" and

took the money and never returned. She testified that she decided to keep the money and give it to Hite in payment of a debt she owed him. Erickson thus entered the house, gave the money to Hite, explained to him what she was doing, and left the house by sneaking around the back.

After waiting fifteen to thirty minutes, Kirby and Boggs decided that Erickson was not going to return. According to Kirby, he then said, "It's just $120, let's go," and they returned to the Coffee Cup where they once again met Shepherd. According to Shepherd, Kirby told him Erickson never came out of the house and asked him to go back to the house with him. However, Kirby testified that Boggs talked with Shepherd, who said that he had done business with Erickson before and could get the money back. Kirby then said, "Let's go" and drove them back to the house. Upon returning to Hite's home, Kirby and Shepherd went up to the house, leaving Boggs to wait in the car. Three different versions of what next transpired were related at trial.

According to Shepherd, Kirby knocked on the door and put his hand over the peephole. When someone approached the door from the other side, Kirby asked if "the girl" was there. When he was told that she was not, Kirby said he wanted either his money or the stuff. The door then opened a crack and a "split second" later Kirby was in the house. Shepherd could not tell whether Kirby kicked the door in or whether he just leaned on it. Kirby immediately held Hite up against the wall and placed a gun to his neck. At this point, Shepherd saw no gun but Kirby's. Still grappling, Kirby and Hite went down some nearby stairs to the basement. Shepherd followed them downstairs along with Kathy Aspeotis, who lived with Hite. Next, shots were fired and Shepherd saw a gun drop out of

Hite's hand. Nothing was said prior to the shooting. Shepherd never saw Hite fire his gun, although he did see fire coming from Kirby's gun. After returning to the car, Kirby told Shepherd that he had had to shoot Hite because Hite fired first. They then went to a bar and Shepherd heard Kirby tell someone he had had to shoot a guy.[6]

Aspeotis told a second version of the events. According to her, about thirty to forty-five minutes after Erickson left she heard a pounding on the door. It was Kirby, who wanted to come in and look through the house. Hite put the chain on the door and asked Aspeotis to get his gun, which she apparently did. Hite then opened the door with the chain on it, and it was immediately kicked in. Kirby grabbed Hite and put his gun to Hite's neck. Hite's gun remained at his side. There was never any indication that Kirby was even aware that Hite had a gun. Kirby did not touch or grab the arm or hand that held Hite's gun and did not order Hite to drop the gun. Kirby and Hite, followed by Aspeotis and Shepherd, went down the stairs to the basement. Even though there was very little talking, Kirby did tell Hite not to shove him and Hite said he was not doing anything. Then, without any questions asked, and without Hite having done anything, Kirby's gun went off. Hite fell, sat up, and fired his gun. Kirby and Shepherd fled. While passing Aspeotis, Kirby pointed his gun at her and she heard a click, although she did not know what it was.[7]

Lastly, we have Kirby's version of the events. According to his account, after they drove to Hite's house Shepherd asked Kirby to accompany him to the door. Apparently Shepherd figured that since Erickson thought she knew Kirby he would be

---

"I paid," thus indicating his active involvement in the cocaine transaction. Kirby countered such a conclusion, stating that he was wrong in his earlier statement and that he had just done a poor job of choosing his words.

**6.** At trial, Berl Schiver, a cook at the bar where Kirby and Shepherd went following the shoot-

ing, testified that Kirby told him that someone started shooting at him and that he shot back, though he did not know whether he had actually shot the guy or not.

**7.** Shepherd testified that he neither saw Kirby point his gun at Aspeotis nor heard a click.

able to talk to her.[8]  Overall, it was Shepherd's and not Kirby's idea to go to the house.  Kirby concluded that Shepherd's interest in his reputation motivated him to attempt to get the money back from Erickson.  Kirby agreed to accompany Shepherd even though he did not really expect Erickson to return the money.  Kirby assumed that the trip to the door of the house would only take a moment; either Erickson would return the money or she would not, and that would be that.  Kirby claimed that he did not care whether Erickson turned over the money or not.

In any case, Kirby and Shepherd went up to the house and had a two to three minute conversation with Hite through the door.  Hite denied that Erickson had even come to the house.  At this point, the door opened a crack and Kirby saw that Hite had a gun in his hand.  Just as Kirby was turning to tell Shepherd that they should leave, Shepherd kicked in the door.[9]  Since he was leaning against the door at time, Kirby sort of fell in.  While shouting to frighten Hite, Kirby grabbed Hite's left hand (his gun hand).[10]  Kirby then drew his gun[11] and put it to Hite's head as the momentum of the entry led them to stumble down the nearby stairs together.  According to Kirby, he spoke in a normal tone as they descended the stairs.  Both while traveling down the stairs and at the bottom of the stairs Kirby claimed to have said to Hite that he just wanted to

talk and then leave.  Kirby also stated that he asked Hite to drop his gun, but that he refused.

It was Kirby's contention that he and Hite never really engaged in any struggling.  While descending the stairs, they were merely jostling to maintain their balance.  Once they got downstairs there was no struggling at all.  Kirby then let Hite go, took one step, and heard Hite's gun go off.  He felt a bullet go by his ear and hair.  Kirby was not certain as to what happened next.  At the time of the incident Kirby did not know with certainty whether he had shot Hite.  (Afterwards he had to ask Shepherd if he had hit Hite.)   After Kirby stopped shooting no more shots were fired.  Due to the continuous roar, Kirby could not tell whether Hite had fired any shots while Kirby had been shooting.  Kirby and Shepherd then fled the scene.

Kirby's main contention on appeal is that the trial court erred in refusing to instruct on AS 11.41.115(c), known as the felony-murder merger doctrine.  Kirby was convicted of murder in the second degree for a violation of AS 11.41.110(a)(3), the felony-murder provision.  Specifically, Kirby was convicted of killing Hite during the commission of a first degree burglary.  The burglary which Kirby allegedly committed or attempted to commit involved either entering or remaining unlawfully in Hite's house with the intent to commit a crime—either

---

**8.** Though Shepherd also knew Erickson, he apparently did not know her very well.

**9.** Kirby testified that Shepherd later told him that he kicked the door inadvertently in an effort to kick the gun out of Hite's hand.  This testimony directly contradicts that of Shepherd who claimed that it was Kirby who forced in the door.

**10.** Kirby stated that he grabbed Hite in reaction to the noise of the door, the presence of Hite's gun, and the fact that he did not know Hite.

**11.** It is Kirby's testimony that he unintentionally carried a gun to the door of Hite's house.  Kirby had been target shooting earlier in the week and had neglected to remove his guns from the floor of his car.  Earlier that night when getting out of the car at the Coffee Cup, Kirby accidently kicked a pistol onto the pave-

ment.  Irritated by his failure to have removed the guns from the car, Kirby slammed the car door shut and placed the gun in his back pocket.  Kirby did not know whether or not the gun was loaded.  It is Kirby's claim that he forgot about the gun until he bumped it on the door-jamb of Hite's house while talking to Hite through the door.  For fear of dropping and losing his gun, Kirby at this time transferred it to his front pocket.  Thus, according to Kirby, the easy accessibility of his gun upon entry into Hite's house was due to inadvertence rather than to intent.

It is worth noting that cross-examination brought out that in an earlier statement to the police, Kirby had said that Shepherd had explicitly told him to get his gun because "it may be cheaper if we had some heat with us."  Kirby discounts this statement by claiming he lied when he said it.

assault or robbery. The burglary was aggravated to first degree burglary because Kirby was armed with a firearm during its commission. AS 11.46.300.[12]

AS 11.41.115(c) reads as follows:

A person may not be convicted of murder in the second degree under § 110(a)(3) of this chapter if the only underlying crime is burglary, the sole purpose of the burglary is a criminal homicide, and the person killed is the intended victim of the defendant. However, if the defendant causes the death of any other person, the defendant may be convicted of murder in the second degree under § 110(a)(3) of this chapter. Nothing in this subsection precludes a prosecution for or conviction of murder in the first degree or murder in the second degree under § 110(a)(1) or (2) of this chapter or of any other crime, including manslaughter or burglary.

The commentary to the code, 1978 Senate Journal Supp. No. 47, at 11–12 (June 12, 1978), explains this section as follows:

Subsection (c) was referred to at Criminal Law Subcommission meetings as the "felony-murder merger doctrine." In considering this extremely limited ex-

emption from the felony-murder rule, it must be recalled that the purpose of the rule is to diminish the risk of unintentional or even accidental killings during the commission of violent felonies. One of these felonies, burglary in the first degree, occurs when a person enters a dwelling with intent to commit a crime. If a person commits burglary in the first degree by breaking into a house with intent to kill the occupant, the felony-murder rule would have no deterrent effect. Permitting a conviction for murder under the felony-murder rule in this circumstance would also have the effect of preventing the jury from considering whether the defendant acted in the "heat of passion."

■ In deciding whether the trial court should have instructed on the felony-murder merger doctrine, we look at the facts in the light most favorable to Kirby. We believe that a reasonable juror could have concluded that Kirby entered Hite's residence with the intent to commit a criminal homicide. It is also possible that the jury could have found that Kirby's entry into Hite's residence was by accident or not for the purpose of committing a crime.[13] How-

---

**12.** AS 11.41.100(a)(1) reads in pertinent part:
*Murder in the first degree.* (a) A person commits the crime of murder in the first degree if, with intent to cause the death of another person, he
(1) causes the death of any person....
AS 11.41.110(a) reads as follows:
*Murder in the second degree.* (a) A person commits the crime of murder in the second degree if
(1) with intent to cause serious physical injury to another person or knowing that his conduct is substantially certain to cause death or serious physical injury to another person, he causes the death of any person;
(2) he intentionally performs an act that results in the death of another person under circumstances manifesting an extreme indifference to the value of human life; or
(3) acting either alone or with one or more persons, he commits or attempts to commit arson in the first degree, kidnapping, sexual assault in the first degree under § 410(a)(1) or (2) of this chapter, sexual assault in the second degree, burglary in the first degree, escape in the first or second degree, or robbery in any degree and, in the course of or in furtherance of that crime, or in immediate

flight from that crime, any person causes the death of a person other than one of the participants.
AS 11.46.300(a) reads as follows:
*Burglary in the first degree.* (a) A person commits the crime of burglary in the first degree if he violates § 310 of this chapter and
(1) the building is a dwelling; or
(2) in effecting entry or while in the building or immediate flight from the building, he
(A) is armed with a firearm;
(B) causes or attempts to cause physical injury to a person; or
(C) uses or threaten [sic] to use a dangerous instrument.
AS 11.46.310(a) reads as follows:
*Burglary in the second degree.* (a) A person commits the crime of burglary in the second degree if he enters or remains unlawfully in a building with intent to commit a crime in the building.

**13.** The commentary to the criminal code following AS 11.46.350 quotes Criminal Code Revision Subcommission, 3 Tentative Draft 53 (1977) in stating that "an initial lawful entry, followed by an unlawful remaining, constitutes

ever, despite such a finding, the jury may still have concluded that Kirby committed a first degree burglary by unlawfully remaining in Hite's house with the intent to commit a criminal homicide. *See* AS 11.46.310. In any of these possible versions of the facts the jury could not have convicted Kirby of felony-murder because of the provisions of the felony-murder merger doctrine. We therefore find that the trial judge committed error by not instructing on the provisions of AS 11.41.115(c), since the provisions of that statute could have applied to Kirby's case.

The state argues that if it was error for the trial judge to refuse to instruct on the felony-murder merger doctrine, the failure to instruct on that doctrine was harmless error. It is the state's position that if Kirby committed a burglary based upon the intent to commit a criminal homicide, bringing himself within AS 11.41.115(c), the jury must have found that Kirby had the requisite intent to commit second degree murder under AS 11.41.110(a)(1) or AS 11.41.110(a)(2). The state therefore reasons that the only difference between felony-murder and murder in the second degree under AS 11.41.110(a)(1) or (a)(2) in Kirby's case would be that Kirby was not entitled to a heat of passion defense under the felony-murder provision. The state contends that Kirby presented no evidence which would entitle him to a heat of passion defense, and therefore the failure to instruct on the felony-murder merger doctrine was harmless error.

AS 11.41.115(a) establishes the heat of passion defense. That statute reads as follows:

*Defenses To Murder.* (a) In a prosecution under § 100(a)(1) or 110(a)(1) of this chapter, it is a defense that the defendant acted in a heat of passion, before there had been a reasonable opportunity for the passion to cool, when the heat of passion resulted from a serious provocation by the intended victim.

Serious provocation is defined in AS 11.41.115(f)(2) as follows:

(2) "serious provocation" means conduct which is sufficient to excite an intense passion in a reasonable person in the defendant's situation, other than a person who is intoxicated, under the circumstances as he reasonably believed them to be; insulting words, insulting gestures, or hearsay reports of conduct engaged in by the intended victim do not, alone or in combination with each other, constitute serious provocation.

We believe that it was a jury question whether Kirby shot Hite under facts amounting to serious provocation. If the defendant's request for the felony-murder merger doctrine instruction had been granted the defendant could have argued that under the facts presented at trial he could not be convicted of felony-murder. He could have argued that he entered the Hite residence by accident when he was pushed through the door. He then encountered Hite, who was also armed, inside the residence. Hite and Kirby jostled their way down the stairs. Kirby thought that Hite was going to shoot him, perhaps because Hite first fired on Kirby. Kirby then killed Hite, acting in the heat of passion. Under this hypothetical argument the jury could have found that Kirby did not enter Hite's residence unlawfully. The burglary occurred when Kirby remained unlawfully in Hite's residence and formed the intent to commit a criminal homicide. Yet, because the purpose of the burglary was the criminal homicide, the felony-murder merger doctrine would apply. Therefore, the jury could not convict Kirby of felony murder. Rather, if the jury found that Kirby acted in the heat of passion in killing Hite, they could only convict of manslaughter.

■ The state argues that the jury, in rejecting a self-defense argument, also must have rejected any heat of passion argument. We do not think this conclusion is correct. The conditions for self-defense are

burglary if the intruder remains with the intent to commit a crime. If such intent is absent, the

crime of criminal trespass has occurred."

set out in AS 11.81.330 and AS 11.81.335.[14] Self-defense has very specific requirements which the jury found that Kirby did not meet. This finding does not preclude a heat of passion defense. For instance, the jury could have found that Kirby's belief that he needed to defend himself was not reasonable or that Kirby was not entitled to self-defense because he was the initial aggressor. AS 11.81.330(a)(1) and (3). Yet the jury could have found that although Kirby was not entitled to an acquittal because he had not acted in self-defense, his conduct was mitigated to manslaughter because he acted in the heat of passion. The jury could have found, for example, that although a reasonable man would not believe it was necessary to defend himself, a reasonable man in Kirby's situation might have acted in panic when confronted with an armed man who, according to Kirby's testimony, would not drop his weapon or let Kirby retreat from the house.[15]

In reviewing this issue, this court notes that the jury instructions given in this case did not preclude an argument that heat of passion was a defense to felony-murder.[16]

14. Sec. 11.81.330 reads as follows:

*Justification: use of nondeadly force in defense of self.* (a) A person may use nondeadly force upon another person when and to the extent he reasonably believes it necessary to defend himself from what he reasonably believes to be the use of unlawful force by the other person, unless

(1) the force involved was the product of mutual combat not authorized by law;

(2) the person claiming the defense of justification provoked the other person's conduct with intent to cause physical injury to the other person; or

(3) the person claiming the defense of justification was the initial aggressor.

(b) In circumstances described in (1)–(3) of (a) of this section, the person claiming the defense of justification may use nondeadly force if he has withdrawn from the encounter and effectively communicated his withdrawal to the other person, but the other person persists in continuing the incident by the use of unlawful force.

Sec. 11.81.335 provides:

*Justification: Use of deadly force in defense of self.* (a) Except as provided in (b) of this section, a person may use deadly force upon another person when and to the extent

(1) the use of nondeadly force is justified under § 330 of this chapter; and

(2) the person reasonably believes the use of deadly force is necessary to defend himself from death, serious physical injury, kidnapping, sexual assault in the first degree under AS 11.41.410(a)(1) or (2), sexual assault in the second degree, or robbery in any degree.

(b) A person may not use deadly force under this section if he knows that he can with complete safety as to himself and others avoid the necessity of so doing by retreating, except there is no duty to retreat if the person is

(1) on premises which he owns or which are leased to him and he is not the initial aggressor; or

(2) a peace officer acting within the scope and authority of his employment or a person

assisting a peace officer under § 380 to this chapter.

15. Perkins states that "terror, for example, is one of the passions which may dethrone judgment and mitigate a killing to the level of voluntary manslaughter." R. Perkins, *Criminal Law* 66 (2d ed. 1969) (footnote omitted). It appears to be the majority rule that the use of fear to reduce a homicide to manslaughter is not limited to cases of self-defense and that the majority of jurisdictions "recognize that instructions as to provocation and self defense may co-exist." Note, *Manslaughter and the Adequacy of Provocation: The Reasonableness of the Reasonable Man*, 106 U.Pa.L.Rev. 1021, 1026 (1958). The trial judge in Kirby's case did instruct on heat of passion but apparently did not intend that the heat of passion defense apply to the felony-murder charge.

16. Instruction 17 defined felony-murder as second degree murder, reading in part:

NO. 17

The following instruction relates to your consideration of Count II of the Indictment.

A person commits the crime of murder in the second degree if, without legal justification and acting either alone or with one or more persons, he commits or attempts to commit burglary in the first degree, robbery in any degree and, in the course of or in furtherance of these crimes, any person causes the death of a person other than one of the participants.

The first part of instruction No. 25, which defined the heat of passion defense, reads in part:

NO. 25

It is a defense to the charge of murder in the first or second degree that the defendant acted in a heat of passion, before there had been a reasonable opportunity for the passion to cool, when the heat of passion resulted from a serious provocation by the intended victim.

Therefore, if you find that the State has failed to prove beyond a reasonable doubt

We directed the parties to submit supplemental briefs on this issue. Kirby argues that he was precluded from arguing heat of passion as a defense to felony-murder because the trial court had clearly indicated by earlier rulings that he could not argue that a heat of passion defense could apply to a felony-murder charge. Furthermore, it is clear under the criminal code that heat of passion is not a defense to felony murder. AS 11.41.115. Even though the state has argued that the instructions as given strengthen its harmless error argument, it has conceded that the judge did not intend to instruct the jury that a heat of passion defense was possible for felony-murder. Given that both the acknowledged intent of the trial judge and the clarity of the law precluded a heat of passion defense for felony-murder, we believe that Kirby was prevented from arguing that defense. Had the trial court allowed the felony-murder merger instruction, Kirby could have argued a limited heat of passion defense under the felony-murder merger doctrine. We therefore do not find harmless error in the failure to give the felony-murder merger instruction.[17]

The state has argued in its supplemental memorandum that, in the event we do not find that it was harmless error for the trial court to fail to instruct on the felony-murder merger doctrine, we should allow the trial court to enter a verdict of manslaughter if the state does not choose to retry the case as a murder. This argument seems persuasive. Had the felony-murder merger instruction been given and if the jury had not convicted Kirby of felony-murder on the basis of that instruction, the jury would have had to have found that Kirby killed Hite during a burglary which was committed with the intent to commit a criminal homicide. Kirby has argued on appeal that he was unable to argue a heat of passion defense to the felony-murder merger charge because the court did not give the felony-murder merger instruction. Had the jury found that Kirby acted in the heat of passion, this would only serve to reduce the murder charge to manslaughter. Even though a manslaughter charge is not necessarily a lesser included offense of felony-murder, given the jury's finding and the circumstances of this case, it appears that the jury's verdict of felony-murder encompassed a finding of guilt on the manslaughter charge.

However, given the fact that this issue has not been fully briefed in this court and the trial court is in a better position than is this court to rule upon the factual aspects of the case, we remand this issue to the trial court for a decision. On remand,

that Roy C. Kirby did not act in a heat of passion before there had been opportunity for the passion to cool, and that the heat of passion resulted from a serious provocation by the intended victim, then you must find the defendant not guilty of the charge of murder in the first and second degrees. You must then consider whether the defendant is guilty of manslaughter, concerning which I have instructed you.

17. Kirby asks us to adopt the rule that felony-murder based upon burglary does not apply if the burglary is grounded upon an intent to commit an assault upon the eventual victim. This is the rule in California. *People v. Wilson*, 1 Cal.3d 431, 82 Cal.Rptr. 494, 462 P.2d 22 (1969). The rule is based on the theory that the felony-murder rule has little utility for deterrence when the burglary is based upon an offense which is an integral part of the homicide and where the offense is included in the offense charged. The California Supreme Court has chosen to limit the cases in which felony-murder can be shown. The majority rule allows a conviction for felony-murder where the underlying crime is a burglary which is based upon an intent to assault the eventual victim. The leading case is *People v. Miller*, 32 N.Y.2d 157, 344 N.Y.S.2d 342, 297 N.E.2d 85 (1973). The New York court reasoned that by permitting a felony-murder conviction for a burglary, during which a homicide was committed, the legislature was giving greater protection to people in dwellings. The court reasoned that a person in a dwelling, particularly his own, was more likely to resist an assault and that a person in a dwelling had fewer avenues of escape open to him than a person assaulted on the street.

We see no reason to broaden the legislative language which indicates that a person cannot be convicted of felony-murder, "if the only underlying crime is burglary, the sole purpose of the burglary is a criminal homicide, and the person killed is the intended victim of the defendant." AS 11.41.115(c).

the state may decide that it wishes to retry this case on a murder charge. If the state does not want to retry the case on the murder charge, the trial court would have discretion to determine whether a manslaughter conviction should be entered against Kirby. Before allowing a manslaughter conviction to be entered against Kirby, the court should decide whether the manslaughter conviction was included within the felony-murder verdict, taking into account the facts of the case and the fact that the felony-murder merger instruction was not given. The court may enter a verdict of manslaughter if it determines that the jury's verdict did encompass a manslaughter verdict and that Kirby has not otherwise been unfairly prejudiced by the entry of a manslaughter conviction. If the court decides that a manslaughter conviction should be entered, the court may sentence Kirby. If the court determines that a manslaughter verdict should not be entered, then the state may elect to retry Kirby.[18]

The conviction is REVERSED and the case is REMANDED for further proceedings.

---

**18.** We dispose of Kirby's other points on appeal as follows:

  a. We do not find that the indictment was duplicitous. Count II of the indictment charges Kirby with but one offense—felony-murder during the commission of a burglary. We also find the indictment sufficiently informed Kirby of the charges against him.

  b. The trial judge did not err in failing to instruct the jurors either that they had to agree that Kirby committed burglary based upon the robbery charge or that they all had to agree that Kirby committed burglary on the assault charge. Since assault is a lesser-included offense of robbery, it is clear that in order to convict Kirby, all of the jurors had to agree that he was guilty of assault. *Christie v. State*, 580 P.2d 310, 321–22 (Alaska 1978).

  c. We find there was sufficient evidence for the jury to find that Kirby entered Hite's residence with an intent to rob. We therefore find no error in failing to grant Kirby's motion for judgment of acquittal on this point.